**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO.: CV – 03-3492 JRT/FLN**

| | |
|---|---|
| Thomas Schaffhausen,<br><br>       Plaintiff,<br><br>  -vs-<br><br>Bank of America, N.A.; Experian Information Solutions Inc.; CSC Credit Services, Inc.; Equifax, Inc. d/b/a Equifax Information Services Inc.; and The CBE Group, Inc.,<br><br>      Defendants. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS BANK OF AMERICA'S, EXPERIAN'S, CSC'S, AND EQUIFAX'S MOTIONS FOR SUMMARY JUDGMENT** |

## INTRODUCTION

This case involves the extended and repeated failure of Defendants to accurately report the status of Plaintiff's Bank of America account on his credit reports. The evidence shows that Defendants Experian, CSC, and Equifax, all credit reporting agencies, unreasonably disregarded or failed to properly process information sent to them, in violation of the Fair Credit Reporting Act, specifically 15 U.S.C. § 1681e(b). The investigation requirements and requirements for subsequent handling of information under 15 U.S.C. § 1681i were also violated. Defendant Bank of America (BOA), for its part, failed to perform reasonable investigations as required of information furnishers under 15 U.S.C. § 1681s-2(b). All Defendants engaged in credit defamation. As a result of Defendants' unlawful conduct, Plaintiff was denied credit, incurred out-of-pocket expenses, and suffered emotional distress. Accordingly, Defendants' Motions for Summary Judgment should be denied in their entirety.

1

## FACTS

**The BOA account**

On or about December 7, 1999, Plaintiff and BOA agreed to a settlement of his BOA MasterCard Account #5420-7612-2964-6482 with a payment of $5,004.00. (See Compl. Ex. 1.) Prior to December of 1999 Plaintiff's BOA account was never in collections or seriously delinquent according to billing statements.   Defendant BOA had not reported nor had the Defendant Credit Reporting Agencies ever listed the BOA account as "charged off."   Bank of America has repeatedly admitted that it was incorrect to report Plaintiff's Bank of America account #5420 xxxx xxxx xxxx as "charge off."   (See, e.g., Compl. Ex. 14 ("Your account was settled in full on 12/09/99 and should not reflect charge off."); Goolsby Aff. ¶ 2, Ex. A – excerpts from Hudson depo. 79:25-80:3; Goolsby Aff. ¶ 3, Ex. B – excerpts from Marshall depo. 18:20-21 ("That was inaccurate, correct?   Yes, sir.").)   Defendant BOA confirmed receipt of Plaintiff's settlement and payment in a letter dated December 20, 1999.   (See Compl. Ex. 1). However, Exhibit 1 mistakenly stated that there was a remaining balance of $1379.24 when in fact the balance should have been zero.   (See Compl. Ex. 2 - letter from BOA to Plaintiff confirming settlement dated December 2, 1999).

Bank of America's records indicate that the account was settled on December 2, 1999, (see Goolsby Aff. ¶ 4, Ex. C – excerpts from BAO log journals, BOA 139) but was designated for *internal* purposes as a charge off only subsequently, on January 3, 2000 (see id., BAO 132).

**The disputes in 2000**

In light of the error in the letter from BOA, Plaintiff was concerned that BOA did not keep up its end of the settlement contract to credit report the recent settlement properly and wrote to Defendant CSC to obtain a copy of his consumer report. (See Compl. Ex. 3).   Plaintiff's

January 25, 2000 consumer report from Defendant CSC reported a status of R9, a balance of $1379, and an indication of that it was a "charged off account."  (<u>See</u> Compl. Ex. 4).

Plaintiff disputed to Defendant CSC via a Research Request Form dated February 1, 2000.  (<u>See</u> Compl. Ex. 5).  Plaintiff explained that the account was not a charge off, but instead that he had paid the account off.  (<u>See</u> <u>Id</u>.)  Plaintiff enclosed a copy of the credit report, on which he wrote that the $1379 balance "should be -0-," that "charged off account" should instead say "settlement," and that the R9 status should be changed.  (<u>Id</u>.)

CSC now states, "It appears that CSC conducted a reinvestigation in which BOA verified the information CSC was reporting and modified the status of the BOA account to 'paid charge off' with a $0 balance."  (Fogleman Decl. ¶ 20.)  BOA acknowledges receiving this dispute from CSC, [cite] but neither CSC nor BOA can now produce the Consumer Dispute Verification form (CDV) that supposedly passed between them.  At any rate, in a report dated February 23, 2000, CSC updated the account to reflect "paid charge off" with a $0 balance, but otherwise reported the account as before.  (Compl. Ex. 6.)  Specifically, the derogatory R9 status remained.

Outraged by this continued misreporting, Plaintiff immediately faxed a copy of his inaccurate Defendant CSC consumer report to Scott Sherwood at BOA on February 24, 2000, and instructed him to promptly change the indication of "paid charge off" to "settlement" and R9 to R1.  (<u>See</u> Compl. Ex. 7.)  In a letter dated February 29, 2000, Defendant BOA responded to Plaintiff, acknowledging the need to update the account and confirming that it should reflect "settled in full." (<u>See</u> Compl. Ex. 8.)

BOA represented that it had so notified Trans Union, Experian, and Equifax.  (<u>See</u> <u>Id</u>.) BOA's representative A'Da Tucker testified that according to BOA's records, BOA did indeed send a Universal Date Form (UDF) to the Trans Union, Experian, and Equifax, instructing that

the change be made.  (See Goolsby Aff. ¶ 5, Ex. D - Tucker depo 8:2-12:2, Ex. 1.)  Neither Experian nor Equifax acknowledge receiving such a communication (see Hughes Aff), but Tucker's testimony is corroborated by the fact that Trans Union appears to have gotten the message.  (See Goolsby Aff. ¶ 6, Ex. E - 11/07/02 Trans Union credit report (showing no charge off).)  While BOA does not claim to have sent the letter to CSC, Equifax avers that it forwards account updates and changes to its affiliate, CSC.  (Fluellen depo. 28:5-6.)  The evidence thus suggests that Equifax and/or CSC, as well as Experian, either disregarded the UDF or failed to properly process it.

Plaintiff checked his consumer reports again and discovered the BOA tradeline was still reporting inaccurately.  He immediately wrote to BOA representative Sherwood via facsimile dated March 6, 2000.  (See Compl. Ex.  9).  Sherwood called Plaintiff back on or about March 6, 2000, and assured him that it would be taken care of immediately.  Accordingly, Plaintiff believed that the matter was taken care of by Defendant BOA in the second quarter of 2000.

**The disputes in 2002**

In September of 2002 Plaintiff attempted to refinance his home mortgage and learned that the Defendant BOA tradeline was still being reported as delinquent and charged off on credit reports being issued by Defendants according to the CBE Group.  (See Compl. Ex. 10).  In November of 2002 Plaintiff ordered his consumer reports from Equifax, Experian, and Trans Union.  In response to the request Plaintiff sent to Equifax, Plaintiff received a credit report from Equifax's affiliate, CSC.  The credit reports Plaintiff received, with the exception of Trans Union's, still showed the inaccuracies on the BOA tradeline.

Specifically, CSC's November 7, 2002 credit report still showed "paid charge off," with a status of R9, although the balance was correctly shown as zero.  (CSC/SJ 002.)  On November

14, 2002, Plaintiff again disputed to CSC, this time via telephone.  (Fogleman Decl. ¶ 22.)  In an Automated CDV (ACDV) bearing both CSC and Equifax's names, the dispute was forwarded to BOA.  (<u>See</u> CSC/SJ 003.)

BOA's goal is for its representatives handling CDVs to spend only three to five minutes processing each dispute.  (Goolsby Aff. ¶ 2, Ex. A - Hudson depo. 17:3-4.)  Not surprisingly, BOA's response to CSC's ACDV, dated 11/18/2002, was convoluted.  The "authorized responder" field was left blank.  (<u>See</u> CSC/SJ 003.)  The anonymous BOA agent did not check the box on the ACDV form for "verified as reported," but instead checked, "Exception."  (<u>Id.</u>)  Nevertheless, in a field for "Responses/Reason(s) for change," BOA stated, "035: VERIFIED AS REPORTED."  (<u>Id.</u>)  Despite thus indicating that the reported information was correct, BOA indicated that the last payment date should be changed from 11/1999 to 12/1999 *and that the balance owing should be changed from $0 to $1379*.  (<u>Id.</u>)  Changing the balance from $0 to $1379 was precisely the reverse of what BOA had instructed in response to the previous dispute from CSC.  (<u>Compare</u> Fogleman Decl. ¶¶ 18, 20 <u>with</u> Fogleman Decl. ¶ 25.)

Despite this convoluted and equivocal response from BOA, CSC unquestioningly reinserted the very $1379 balance it had deleted pursuant to Plaintiff's prior dispute.  (<u>See</u> CSC/SJ 005.)  CSC failed to follow-up with BOA regarding its flip-flop, and failed to follow-up with BOA regarding any of the other disputed information, despite the doubt cast on the reliability of BOA's reporting by the blatant reversal.  CSC's November 19, 2002 response letter to Plaintiff failed to state that anything was being reinserted or otherwise changed – to the contrary, CSC indicated that it would continue to report the status the same way.  (<u>See</u> CSC/SJ 004.)  CSC did not provide Plaintiff with a telephone number for BOA.

Plaintiff disputed with Experian via telephone on November 13, 2002, and Experian forwarded the dispute to BOA.  (See Hughes Aff. ¶ 4, Ex. B.)  The ACDV shows that BOA responded on 11/18/2002.  (See Hughes Aff. Ex. B.)  Despite indicating to CSC on the very same day that the balance owing should be changed from $0 to $1379, BOA indicated to Experian no change to the balance, the field for which was blank.  (See Id.)  BOA failed to indicate that the charge off should be removed and in fact provided a free-form response stating, "Account charged off/settled."  (Hughes Aff. ¶ 13, Ex. B.)  Experian responded to Plaintiff on November 27, 2002, that the information was verified as reported.  (See Compl. Ex. 13.)

Plaintiff, again outraged by the continued inaccuracies, contacted BOA directly to complain and dispute the illegal reporting.  Defendant BOA responded to Plaintiff's dispute communication with a facsimile dated December 24, 2002, admitting the misreporting and vowing to change it.  (See Compl. Ex. 14.)  The letter stated, in part:

> A request has been submitted to delete the R9, Charge off status, from all major credit bureaus.  Your account was settled in full on 12/09/99 and should not reflect charge off.  It has a zero balance.  Please understand it will take 60-90 days for these updates to reflect on our credit bureau so you can use this letter to verify the changes have been made.

(Id.)  BOA's representative Brenda Marshall testified that pursuant to BOA's regular practice, notice would have been sent concurrently to the major Credit Reporting Agencies to remove the charge off and reflect a zero balance.  Indeed, Experian appears to have finally gotten the message this time, as Experian did just that.  (Hughes Aff. ¶ 16.)  Hughes' testimony corroborates Marshall's testimony that BOA did indeed sent an update to the CRAs in December 2002, which should have been processed by the CRAs in the first quarter of 2003.

However, Equifax and its affiliate CSC, to whom Equifax, as noted, supposedly forwards updates, failed to change their reporting as BOA instructed.  On April 28, 2003, Plaintiff pulled

his credit report to check for accuracy and discovered that Equifax still reported the BOA account as a $1379.00 balance that was a "bad debt" and "placed for collection & skip" in other words "charged off."  (See Compl. Ex. 16.)  CSC continued to report R9 and a balance of $1379 as recently as August 20, 2003.  (See Goolsby Aff. ¶ 7, Ex. F – 8/20/03 CSC credit report.)

**Plaintiff's damages**

Plaintiff noticed in the inquiry section of his November 19, 2002 CSC credit report that several companies had reviewed his Defendant CSC consumer report and would have seen the inaccurate and derogatory BOA tradeline.

Plaintiff has testified that he has been diagnosed with ulcers, and that they flair up when he is subjected to "stress, anxiety, frustration, anger."  (Goolsby Aff. ¶ 8, Ex. G – Schaffhausen depo. 120:23-123:3.)  Plaintiff testified further that credit reports that he cannot fix top the list of things that cause that kind of stress.  (See Id. 123:4-10.)  Plaintiff testified that he has been humiliated and embarrassed, and that he has suffered physical manifestations of his emotional distress:  "I've had lost sleep, I've been irritable, I've snapped at my employees, I've been afraid to approach somebody, I have been embarrassed." (Id. 131:15-19.)

Plaintiff believed that Defendant BOA would follow through on its promise, but discovered April of 2003 when he attempted to purchase and finance a new car that the Defendant BOA tradeline was still reporting as a charge off.  (Id. 93:19-94:14.)   Embarrassed and humiliated at the dealership, Plaintiff had to settle for financing through an outside bank at a higher rate because the BOA charge off prevented him from taking advantage of the special incentive program the dealership was offering to buyers with qualified credit.  (Id. 94:20-96:12.) Later that day Plaintiff, exasperated with Defendant BOA, wrote a final letter, dated April 4, 2003, and faxed it to Defendant BOA's representative B. Marshall demanding satisfaction. (See

Compl. Ex. 15.)  On April 28, 2003, Plaintiff incurred additional out of pocket loss in the amount of $39.00 when he was forced to obtain his own merged online credit report to check it for accuracy.  (See Compl. Ex. 16.)

## ARGUMENT

### I.   LEGAL STANDARD

Summary judgment is granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding on a motion for summary judgment, the evidence of the non-moving party must be believed as true, all doubts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  So long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe, and summary judgment is not appropriate.  See Id. at 552.  A genuine issue of material fact exists when the evidence before the court is such that reasonable persons could return a verdict in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).

### II.   EACH OF THE DEFENDANTS VIOLATED THE FCRA.

#### A.   **The FCRA is a consumer protection statute.**

A brief discussion of the FCRA and its relevant sections provides helpful background to the nature of Plaintiff's FCRA claims and why Defendants' Motions should be denied.

As Congress explained in the FCRA itself:

> It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

15 U.S.C. § 1681(b); see, e.g., Philbin v. Trans Union Corp., 101 F.3d 957, 962 (3d. Cir. 1996). The FCRA was prompted by "congressional concern over abuses in the credit reporting industry." Philbin, 101 F.3d at 962; see also Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329 (9th Cir. 1995). Further, it is fashioned so as to protect the credit worthiness and reputation of every consumer. Ackerly v. Credit Bureau of Sheridan, Inc., 385 F. Supp. 658, 659 (D. Wyo. 1974). The FCRA was crafted to protect consumers from the transmission of inaccurate information about them. Kates v. Croker National Bank, 776 F.2d 1396, 1397 (9th Cir. 1985). Like the other portions of the Consumer Credit Protection Act of 1968, the FCRA is to be *liberally construed in favor of the consumer.* See Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329 (9th Cir. 1995) (emphasis added).

Congress enacted the FCRA to protect consumers against "the trend toward . . . the establishment of all sorts of computerized data banks [that place a consumer] in great danger of having his life and character reduced to impersonal 'blips' and key punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable." Dalton v. Capital Associated Industries, Inc., 257 F. 3d 409 (4th Cir. 2000), (citing 116 Cong. Rec. 36570). As a result, the FCRA imposes "*grave responsibilities*" on credit reporting agencies and furnishers to ensure the accuracy of the information that they report. See Cushman v. Trans Union Corp., 115 F. 3d 220, 225 (3d. Cir. 1997) (emphasis added).

**B.  The CRAs violated the FCRA.**

    **1.  Section 1681e(b)**

The FCRA provides, "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added).  A report can be inaccurate within the meaning of the FCRA even if the report is technically true in some narrow sense, but the report is overly general, incomplete or misleading.  See, e.g., Pinner v. Schmidt, 805 F.2d 1258, 1263 (4th Cir. 1986); Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 40 (D.C. Cir. 1984); Thompson v. San Antonio Retail Merchants Ass'n, 682 F.2d 509 (5ᵗʰ Cir. 1982); Alexander v. Moore & Assoc., 553 F. Supp. 948, 952 (D. Haw. 1982); see also Wilson v. Rental Research Serv., Inc., 165 F.3d 642, 644-45 (8th Cir. 1999) (reversing distrcit court and following cases finding that "reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the report and thus may violate § 1681"), vacated by 191 F.3d 911 (granting petition for rehearing en banc), decided on reh'g by 206 F.3d 810 (affirming district court, without published opinion, by equally divided en banc court).

Defendants rely heavily on Cahlin v. GMAC, 936 F.2d 1151 (11ᵗʰ Cir. 1991), but Cahlin is distinguishable, and on the present facts, actually supports Plaintiff.   In Cahlin, the account was "charged off by the creditor and [was] *later* settled for an amount less than the original balance due."  Id. at 1158 (emphasis added).  If, as Cahlin insists, an indication of charge off "reflects the efforts required to collect a debt," Id., then a indication of charge off appearing only *after* an account has been settled is misleading:  obviously no collection efforts are required after an account is settled.

To track with the language of § 1681e(b), the content of the reporting should be measured against the standard of "maximum possible accuracy." Koropoulos, 734 F.2d at 42. Cases to have found that "technically accurate" suffices confuse accuracy with reasonable procedures. That is, the ease or difficulty of gathering a more complete and accurate file goes to whether the procedures were reasonable, not whether the file was accurate. Id.

The reasonableness of procedures is usually a jury question. Olwell v. Medical Information Bureau, Civ. No. 01-1481, slip op. at 12 (JRT/FLN) (D. Minn. 2003) (Goolsby Aff. ¶ 11, Ex. J) (citing Crabill v. Trans Union, 259 F.3d 662, 664 (7th Cir. 2001). The Third Circuit held that once a plaintiff has "demonstrated inaccuracies in his credit report, a defendant can only prevail on summary judgment if it can produce evidence that demonstrates as a matter of law that the procedures it followed were reasonable." Philbin, 101 F. 3d at 965. The fact that a defendant misreported and then reverified false information is evidence of unreasonable procedures. The Third Circuit looked to the cases of Guimond, supra, and Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151 (11th Cir. 1991) and arrived at the conclusion that the mere fact the defendant TRW had issued two credit reports with inaccurate information was "sufficient to permit a jury to infer that TRW did not follow reasonable procedures" in violation of section 1681e(b). Philbin, 101 F. 3d at 966; see also Boris v. Choicepoint Servs., Inc., 249 F. Supp. 2d 851, 856 (W.D. Ky. 2003) (noting that even section 1681(e)(b) claims under FCRA typically are questions for jury).

A CRA's obligation under § 1681e(b) is not extinguished upon receiving notice of a dispute, but instead, by the express language of the statute, attaches "Whenever a consumer reporting agency prepares a consumer report." § 1681e(b) (emphasis added). Thus, a CRA must continue to follow reasonable procedures to assure maximum possible accuracy even after

receiving notice of a dispute.  It is therefore not a complete defense to a § 1681e(b) claim that the CRA's procedures were reasonable prior to receiving the dispute.

Here, as an initial matter, the reporting on Plaintiff's account was inaccurate within the meaning of the FCRA.  Whatever Bank of America's internal system, "Charge off" was not what Bank of America intended as an accurate and appropriate reflection of Plaintiff's credit worthiness.  As <u>Cahlin</u> suggests, indicating "Charge off" on Plaintiff's account lumped him in with debtors who had not paid anything at the time the creditor wrote off the loss, and who only paid in part, if at all, after the creditor subsequently was forced to expend substantial sums in collections.  Here, by contrast, by the time Bank of America designated the account as "charge off" for its own housekeeping purposes, Bank of America was satisfied with Plaintiff and had released him from any further obligation.

In addition, Defendants overlook that the present claims are based not only on the reporting of charge off/R9, but also on the reporting of a balance owing.  It is beyond dispute that the reporting of any balance owing was inaccurate after Bank of America had released Plaintiff from any further obligation.  Thus, Defendants accuracy arguments fail.

Next, a jury could readily find that even before receiving Plaintiff's disputes, the CRAs procedures were unreasonable.  For the CRAs, whether they received the UDF and bureau update forms from Bank of America indicating the account should be changed is at best a disputed issue of fact.  Bank of America testifies that they were sent, and at least Trans Union received one.  Making the reasonable inference that when the updates were sent, the addressees received them, a reasonable jury could conclude that Equifax failed to act accordingly twice, and Experian once.  If Equifax is to be believed that it sent updates along to CSC, CSC also failed to act accordingly twice.

### 2.  Section 1681i

Upon receiving notice from a consumer of a dispute concerning the accuracy or completeness of an item of information on the consumer's credit report, a credit reporting agency has the added and more specific duties of 15 U.S.C. § 1681i.  Under that section, a CRA must perform an investigation,[1] including: (i) providing prompt notice of the dispute to the furnisher of the information, § 1681i(a)(2); (ii) reviewing and considering all relevant information submitted by the consumer, § 1681i(a)(4); (iii) deleting or modifying as appropriate any disputed item of information that is inaccurate, incomplete, or cannot be verified, § 1681i(a)(5)(A); and (iv) providing notice of results to the consumer, § 1681i(a)(6).  See generally § 1681i(a)(1).

Even if the disputed statements had been accurate, but incomplete, Plaintiff nonetheless has a claim under the FCRA, because a CRA's duty to conduct a proper reinvestigation is triggered when "*the completeness* or accuracy" of any item is disputed, 15 U.S.C. § 1681i(a)(1) (emphasis added), and because a CRA is prohibited after reinvestigation from continuing to report information that is "inaccurate *or incomplete*," 15 U.S.C. § 1681i(a)(5) (emphasis added). In the FCRA, the greater showing of inaccuracy, as opposed to mere incompleteness, is only a requirement under § 1681e(b).  Furthermore, § 1681i(a)(5), in addition to encompassing both inaccurate and incomplete information, does not simply mandate that unverifiable information must be deleted, but instead indicates that inaccurate or unverifiable information must be deleted *or modified as appropriate*.

---

[1] The term "investigation" is not defined by the FCRA.  Black's Law Dictionary defines the word "investigation" as "to follow up step by step by patient inquiry and observation.  To trace and track; to search into; to examine and inquire into with care and accuracy; to find out by careful inquisition; examination; the taking of evidence . . . ." *Black's Law Dictionary* at 740 (5th Ed).  Nothing that the CRAs did in this case even remotely resembles an "investigation" so defined.

Courts have noted that "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute. . . . *Whatever considerations exist, it is for 'the trier of fact [to] weigh these factors in deciding whether [the defendant] violated the provisions of section 1681i.' "* Cushman, 115 F. 3d at 225, 227 (citation omitted) (emphasis added).  In so opining, the Third Circuit simply turned to and followed the rulings of other Circuit Courts from around the country which have also found that a credit reporting agency's mere parroting or mimicking process criticized in Cushman falls far short of the type of "investigation" required by section 1681i of the FCRA, and creates a factual issue precluding summary judgment.  See Henson v. CSC Credit Servs., 29 F.3d 280, 286 (7th Cir. 1994) (failure to inquire as to plaintiff's disputes about state court judgment docket a violation of 1681i); Stevenson v. TRW Inc., 987 F.2d 288, 293 (5th Cir. 1993) (only sending CDV forms to plaintiff's creditors and not calling them constituted a violation of the FCRA); Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) (merely making two calls to plaintiff's creditors insufficient investigation); see also Curtis v. Trans Union, Nos. 02-C-207, 02-C-208, 2002 WL 31748838 * 5 (N.D. Ill. Dec. 9, 2002) (Goolsby Aff. ¶ 10, Ex. I) (rejecting argument that merely reporting what credit furnisher provides is sufficient in context of investigation); Richardson v. Fleet Bank of Mass., 190 F. Supp. 2d 81, 88 (D. Mass. 2001) (noting that mere parroting is insufficient and that reasonableness of 1681i investigation usually is question for jury).

The language of the statute makes clear that contacting the furnisher of the information is only one requirement of the investigation a CRA must conduct upon notice of a dispute.  The subsection concerning notice to the furnisher provides, in part, "The notice shall include all relevant information regarding the dispute that the agency has received from the consumer."  15

U.S.C. § 1681i(a)(2)(A).  However, 1681i also provides, "In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information." 15 U.S.C. § 1681i(a)(4).  If § 1681i(a)(4) is to be given independent meaning, the consideration a CRA must give to the information provided by the consumer must entail more than simply finding out what the furnisher has to say about it, as is already required under § 1681i(a)(2).

Section 1681i requires a CRA not only to conduct an appropriate reinvestigation, but also to treat the information appropriately thereafter:

> If, after any reinvestigation under paragraph (1) of any information *disputed by a consumer*, an item of the information is found to be inaccurate *or incomplete or cannot be verified*, the consumer reporting agency shall promptly delete *that item* of information from the consumer's file or modify *that item* of information, *as appropriate,* based on the results of the investigation.

15 U.S.C. § 1681i(a)(5)(A) (emphasis added).  Thus, as the relevant clause is disjunctive, if information is disputed as incomplete and turns out to be so, it is not even a defense to a § 1681i claim that it is strictly accurate.  Incomplete information that tends to mislead the reader into drawing an inaccurate conclusion states a claim under § 1681i.  See Spellman v. Experian Information Solutions, Inc., 2002 WL 799876 at *1 (D. Nev.) (attached as Goolsby Aff. ¶ 12, Ex. K); see also Stewart v. Credit Bureau, Inc., 734 F.2d 47, 55 (D.C. Cir. 1984); Lowry v. Credit Bureau, Inc. of Georgia, 444 F. Supp. 541, 544 (N.D. Ga. 1978).

CSC and Experian failed to perform reasonable investigations when the simply parroted Bank of America without further investigation.  CSC's second investigation was particularly unreasonable as it unquestioningly accepted the convoluted and equivocal CDV response from Bank of America.

Section 1681i also provides:

Requirements relating to reinsertion of previously deleted material. –
<blockquote>

(i)      Certification of accuracy of information. – If any information is deleted from a consumer's file [pursuant to a 1681i dispute] the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

(ii)      Notice to consumer – If any information that has been [thus] deleted . . . is reinserted in file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion . . .

(iii)      Additional information. – As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing . . .

1.  a statement that the disputed information has been reinserted;

2.  the . . . telephone number of such furnisher, if reasonably available . . . .
</blockquote>

15 U.S.C. § 1681i(a)(5)(B).  The act further provides that a CRA must "maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph . . ." § 1681i(a)(5)(C).

CSC did not comply with these provisions when it reinserted the $1738 balance.  Such reinsertion was particularly unreasonable in light of the fact that Bank of America was providing instructions precisely the reverse of the previous dispute.  When something was plainly amiss in Bank of America's reporting, it was manifestly unreasonable for CSC to simply accept Bank of America's assurances of accuracy over Plaintiff's claim to the contrary.

**3.   Bank of America violated the FCRA.**

With respect to furnishers of information, the FCRA provides:

Duties of furnishers of information upon notice of dispute
(1) In general
After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall —
    (A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency; and

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

. . .

15 U.S.C. § 1681s-2(b).

The Fourth Circuit has recently expounded on § 168 ls-2(b):

[T]he plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors. Further, § 168ls-2(b)(1)(A) uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute — and, ultimately, correct — inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, *unreasonable* inquiries by creditors. Cf. Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991) (interpreting analogous statute governing reinvestigations of consumer disputes by credit reporting agencies to require reasonable investigations); Pinner v. Schmidt, 805 F.2d 1258, 1262, (5th Cir. 1986) (same). We therefore hold that §1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute form a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified.

Johnson v. MBNA America Bank, 357 F.3d 426, 430-31 (4th Cir. 2004). While noting that it was the first circuit to address the extent of the investigation required under § 168 ls-2(b), the Johnson court explained, "[D]istrict courts that have considered the issue have consistently recognized that the creditor's investigation must be a reasonable one." Id. at 430, n.2 (citing Olwell v. Med. Info. Bureau, 2003 WL 79035, at *5 (D. Minn. Jan. 7, 2003); Agosta v. Inovision. Inc., 2003 WL 22999213, at *5 (E.D. Pa. Dec. 16, 2003); Buxton v. Equifax Credit Info. Servs., Inc., 2003 WL 22844245, at *2 (N.D. Ill. Dec. 1, 2003); Wade v. Equifax, 2003 WL 22089694, at *2-*3 (N.D. Ill. Sept. 8, 2003); Betts v. Equifax Credit Info. Servs., Inc., 245 F. Supp.2d 1130, 1135 (W.D. Wash. 2003); Kronstedt v. Equifax, 2001 WL 34124783, at *16

(W.D. Wis. Jan. 25, 2001); <u>Bruce v. First U.S.A. Bank,</u>, 103 F. Supp.2d 1135, 1143 (E.D. Mo. 2000)).

The <u>Johnson</u> court concluded that a furnisher's failure upon receiving a dispute to consult underlying documents, such as account applications, could reasonably support a jury finding that the furnisher acted unreasonably. <u>Id</u>. at 430. The <u>Johnson</u> court's discussion is precisely on point: "[a] jury could reasonably conclude that if the MBNA agents had investigated the matter further and determined that MBNA no longer had the application, they could have at least informed the credit reporting agencies that MBNA could not conclusively verify that Johnson was a co-obligor." <u>Id.</u> at 431.The extensive cases presented with the question of whether a CRA's procedures were reasonable are instructive.   As noted above, the reasonableness of procedures is usually a jury question. <u>Olwell</u>

Bank of America's investigation was unreasonable in that it allotted only minutes for its agents to process the CDVs.  As explained, Bank of America gave inconsistent and convoluted responses.  Bank of America apparently did not examine even its own history with Plaintiff, as it verified the disputed information even after promising Plaintiff it would correct it.

Having not conducted a proper investigation, it was impossible for Bank of America to comply with the requirement to report the results of the investigation under § 1681s-2(b)(1)(C). At the very least, Bank of America was required under § 1681s-2(b)(1)(D) to report its findings in each investigation to the other CRAs.  The inconsistent responses to the various CRAs show that Bank of America failed to do this.  Thus Bank of America violated each of the provisions of § 16812s-2(b)(1).  Bank of America's conduct thus also constituted credit defamation.


**III.    PLAINTIFF'S CLAIMS ARE NOT DEFEATED ON THE BASIS OF ANY SUPPOSED DEFICIENCY IN DAMAGES.**

A. **Plaintiff suffered actual damages.**

A Plaintiff is obviously entitled to monetary damages for credit denials and less favorable credit terms caused by inaccuracies on the plaintiff's credit report in violation of the FCRA,A consumer need not show that the erroneous negative information was the only cause of the credit denial, but only that it was a substantial factor.  Philbin v. Trans Union Corp., 101 F.3d 957 (3d Cir. 1996); Richardson v. Fleet Bank, 190 F. Supp. 2d 81, 87 (D. Mass. 2001).  The consumer need not eliminate the possibility that accurate negative information also contributed to the decision to deny credit.  Philbin, 101 F.3d 957 (citing Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1161 (11th Cir. 1991); Guimond, 45 F.3d at 1332-33;  Stewart v. Credit Bureau, Inc., 734 F.2d 47, 54 (D.C. Cir. 1984); Pendleton v. Trans Union Systems Corp., 76 F.R.D. 192, 195 (E.D. Pa. 1977).  Likewise, the U.S. Supreme Court has indicated that in general, where a decision making process involves consideration of multiple factors, each of which bear on the ultimate decision, it is inappropriate to saddle a plaintiff with the burden of proving that one of those factors was the sole cause of the decision.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 241, 244 (1989) (plurality opinion).  The Third Circuit has held that a plaintiff need not pursue other remedies under the act, such as filing a brief statement of the dispute on his own consumer report, before pursuing a claim for damages under 15 U.S.C. § 1681i.  See Cushman v. Trans Union Corp., 115 F.3d 220 (3d Cir. 1997).

It is also well established, in the Eighth Circuit and elsewhere, that to show actual damages under the FCRA, it is not necessary to show a denial of credit.  Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir. 1998) (emotional distress damages available for FCRA violations); Cousin v. Trans Union Corp., 246 F.3d 359, 369 n.15 (5th Cir. 2001) (humiliation and mental distress damages available under FCRA even absent out-of-pocket losses); Casella v.

Equifax Credit Information Services, 56 F.3d 469, 474 (2d Cir. 1995) (same); Sheffer v. Experian Information Solutions, Inc., et al., No. 02-7407. at Loislaw page 4 (E.D. Pa. 2003) (Goolsby Aff. ¶ 13, Ex. L) (denying summary judgment and explaining, "At the very least, Plaintiff may be entitled to damages for the emotional distress he may have suffered in connection with his efforts to correct the error in his Trans Union consumer file and in obtaining credit from a jewelry store around the time he was attempting to have the error corrected." (citing Philbin, 101 F.3d at 963 n.3; Fischl v. Gen. Motors Acceptance Corp., 708 F.3d 143, 151 (5th Cir. 1983))); Richardson v. Fleet Bank, 190 F. Supp. 2d 81, 87 (D. Mass. 2001).  Likewise, actual injury in defamation cases is not limited to out-of-pocket loss.  See Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974).

Damages have been awarded in FCRA cases for loss of sleep, nervousness, frustration, and mental anguish; see, e.g., Millstone v. O'Hanlon Reports, Inc., 383 F. Supp. 269, 276 (E.D. Mo. 1974); Rasor v. Retail Credit Co., 554 P.2d 1041, 1048-50 (Wash. 1976); injury to reputation, family, work and sense of well-being; see, e.g., Morris v. Credit Bureau of Cincinnati, 563 F. Supp. 962, 969 (S.D. Ohio 1983); and humiliation, embarrassment, and mental distress; see, e.g., Fischl v. GMAC, 708 F.2d 143, 151 (5th Cir. 1983) (humiliation and mental distress); Swoager v. Credit Bureau, 608 F. Supp. 972, 977, n.7 (M.D. Fla. 1985).  The humiliation and distress of having potential creditors view false, derogatory information on one's credit report are cognizable damages under § 1681e(b).  Crane v. Trans Union, LLC, 2003 WL 22172346 at *5 (E.D. Pa.) (Goolsby Aff. ¶ 14, Ex. M) (denying summary judgment) (citing Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829, 834-35 (8th Cir. 1976) Philbin, 101 F.3d at 963; Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995); Stevenson v. TRW Inc., 987 F.2d 288, 296 (5th Cir. 1993)).

Even aside from any emotional damages, one can show damages from false negative information on a credit report without showing a denial of credit.  Fischl, 708 F.2d at 151 (injury to reputation and creditworthiness); Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) (damage to plaintiff's name) (quoting 116 Cong. Rec. 36570 (1970) statement of Rep. Sullivan). A consumer with a damaged credit report is placed in a financial bind:  on the one hand, if she applies for credit, she risks getting denied, which would result in additional inquiries on her credit report without the benefit of positive credit.  Inasmuch as each inquiry has a negative impact on one's credit rating, a consumer may feel compelled to refrain from applying for credit until the inaccuracy is fixed, in order to avoid making her credit rating worse.  On the other hand, the consumer who avoids or delays applying for credit is denied the opportunity to purchase a home, car, etc.  Wrongful negative credit information thus impairs one's access to credit, impedes one from conducting one's financial affairs, and thereby damages a consumer whether or not he or she has applied for and been denied credit.

The evidence shows that Plaintiff suffered emotional distress, with physical manifestations, at the hands of all the Defendants.  In addition, Plaintiff was forced to incur out-of-pocket expense to monitor his credit reports.  And of course, a reasonable jury could readily conclude that the inaccurate charge off/R9, balance owing on Plaintiff's CSC credit report was at least a substantial factor in his inability to obtain the more favorable interest rate on his car loan.

Accordingly, there is more than enough evidence to create a genuine issue of material fact as to whether Plaintiff suffered damages.  Therefore, Plaintiff should be permitted to proceed to trial.

**B.  <u>Plaintiff need not show actual damages anyway.</u>**

Under the FCRA, a consumer is entitled to statutory and punitive damages even absent actual damages when the violation is willful. See 15 U.S.C. § 1681n(a)(1); Bakker, 152 F.3d at 1013; Yohay v. City of Alexandria Employees Cr. Union, 827 F.2d 967, 972 (4th Cir. 1987) (noting an award of punitive damages in the absence of any actual damages, in an appropriate case, comports with the underlying deterrent purpose of FCRA); see, e.g., Sather v. Weintraut, Civ. No. 01-1370 (JNE/JGL), slip op. at 7-8 (Minn. July 10, 2003) (Goolsby Aff. ¶ 15, Ex. N) (denying the defendant's Motion for Summary Judgment under § 1681n while finding no actual damages)). Neither malice nor evil motive need be shown to establish willfulness. Thornton v. Equifax, 619 F.2d 700, 705 (8th Cir. 1980); (see also, Def.'s Mem. at 23). Conduct is willful if the defendant knew that such conduct violates the act and it was intentional. Phillips v. Grendahl, 312 F.3d 357, 368, 370 (8th Cir. 2002). It has been held that a reasonable jury could conclude that a CRA's failure to transmit to a creditor the consumer's documentation provided with his disputed is a knowing or reckless violation of the Act. The Eight Circuit established in Phillips that "evidence that each defendant had some experience in dealing with credit reports and . . . knew of the Fair Credit Reporting Act . . . support[s] an inference that the defendants knew that their actions were impermissible." Id. at 371; accord Sather, Civ. No. 01-1370, slip op. at 7-8 (Goolsby Aff. ¶ 15, Ex. N.)

In Minnesota libel cases, when the plaintiff is a private plaintiff involved in a matter not of public concern, damages are presumed. See Advanced Training Systems, Inc. v. Caswell Equip. Co., Inc., 352 N.W.2d 1, 9 (Minn. 1984); 4 Minn. CIVJIG 50.50 at 342 (4th ed. 1999).

It is undisputed that each of the three Defendants had a legal department or compliance department that was highly familiar with the FCRA. Likewise, Bank of America's failure to conduct an investigation that went even as far as checking its own records and Bank of

America's failure to report to all credit bureaus its findings with respect to each of the other disputes were unassailably violations of the Act.  The Defendants therefore cannot claim that their violations were unknowing.   A reasonable jury could further conclude that the repeated actions of Defendants were conscious acts in accordance with policy.  The evidence suggests that all Defendants intentionally placed economy first, never mind the consequences for accuracy.

## IV.   THE FAIR CREDIT REPORTING ACT DOES NOT PRECLUDE PLAINTIFF'S STATE LAW CLAIMS.

In general, there is a presumption against preemption of state law by federal statute.  See Medtronic, Inc.  v. Lour, 518 U.S. 470, 495 (1996); Cipolin v. Leggett Group, Inc., 505 U.S. 504, 516 (1992).  Accordingly, all doubts should be resolved against preemption.

Defendants rely on the following FCRA limitation on liability provision:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to … any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report, except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e); see also 15 U.S.C. § 1681a(k) (defining "Adverse action" as a denial or cancellation of credit or employment).

The coexistence of the FCRA and the state common law torts alleged here does not place conflicting obligations on a furnisher of information.  Hence, the state common law claims are not inconsistent with the FCRA.  Instead, state common law simply provides an additional recourse for the same unlawful conduct.  The FCRA does not preempt state laws as long as the state law is not inconsistent with the FCRA.  Credit Data of Arizona, Inc. v. State of Arizona,

602 F.2d 195, 197 (9th Cir. 1979); see also Hughes v. Fidelity Bank, 709 F. Supp. 639, 640-41 (E.D. Pa. 1989).

The legislative history of the FCRA makes clear the congressional intent for a state law to be deemed "inconsistent" only when compliance with both it and the FCRA is not possible. S.Rep.No.517, 91st Congress, 1st Session 8 (Nov. 5, 1969) ("[N]o state law would be preempted unless compliance would involve a violation of Federal law.").

Likewise, the Federal Trade Commission (FTC) Official Staff Commentary explains, "State Law is pre-empted by the FCRA only when compliance with inconsistent state law would result in violation of the FCRA." 16 C.F.R. § 600.2 App. to Part 600, Commentary to § 622.

Defendants argument that the FCRA preempts Plaintiff's state law claim fails because § 1681h(e) applies only to disclosures required by the Act, and because even if this qualified immunity provision were applicable, the evidence shows the requisite scienter to overcome immunity.

**A. Plaintiff's claims are not preempted because Plaintiff's claims are not based on a disclosure pursuant to 15 U.S.C. §§ 1681g, 1681h, or 1681m, or "by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report."**

By the plain language of § 1681h(e), the heightened standard of malice or willfulness is only applicable to actions based on disclosures pursuant to 15 U.S.C. §§ 1681g, 1681h, or 1681m, or "by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report." 15 U.S.C. § 1681h(e). Sections 1681g and 1681h apply only to credit reporting agencies, and require them to make certain disclosures. Section 1681m and the quoted passage above apply only when a user has taken an adverse action against a consumer, in which case such user is required to make certain disclosures.

Thus, the qualified immunity from tort actions in the form of the heightened scienter requirement is available only if the disclosure is made "*pursuant to requirements of the Act*." Thornton v. Equifax, Inc., 619 F.2d 700, 703 (8th Cir. 1980).  Although the FCRA requires furnishers of information to be accurate in all information they supply, it does not require them to disclose information.  Persuasive authority has explained the rationale for providing immunity only when disclosure is required:

> [S]ection 1681h(e) is not actually a preemption provision.  Rather, it is a *quid pro quo* grant of protection for statutorily required disclosures.  Since various parts of the federal statute require consumer reporting agencies and information users to disclose information to consumers under certain circumstances, this section guarantees that the agencies or users cannot be sued for those required disclosures under state tort law [absent malice or willfulness].  It makes sense that acts required to be done by the FCRA are immunized from state tort liability.

McAnly v. Middleton & Reutlinger, P.S.C., 77 F. Supp. 2d 810, 814-15 (W.D. Ky. 1999).  The McAnly court went on to find no preemption in that case because the disclosure that formed the basis of the suit was not required under the statute.  See Id. at 815.  Similarly, while finding that it need not reach the question of whether pleading malice is required because the plaintiff had pled malice, this Court recently stated, "[Plaintiff] argues, in the alternative, that she is not required to plead malice in this instance because her claim was not 'based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action..' 15 U.S.C. § 1681h(e).  This argument has its appeal."  Mattice v. Equifax et al. Civ. No. 03-1060 at 8 n.2 (RHK/JSM) (D. Minn. June 13, 2003) (Goolsby Aff. ¶ 16, Ex. O); see also Whitesides v. Equifax Credit Information Services, Inc., 125 F. Supp. 2d 807, 811 (W.D. La. 2000) (permitting the plaintiff to proceed with a defamation claim, finding that the heightened scienter element of section 1681h(e) was not triggered because the defendant's

disclosures did not fall within the ambit of disclosures required by the FCRA).  The Eighth Circuit's finding of preemption in Rhodes v. Ford Motor Credit Co., 951 F.2d 905 (8th Cir. 1991), is not to the contrary because in that case, although FMCC was a credit furnisher whose disclosures may not have been required by the act, the plaintiff did not argue that a showing of malice or willfulness was unnecessary in that circumstance, but instead argued only that malice or willfulness had been shown.  Id. at 906 n.2.  Therefore, the question of whether an exception to the heightened scienter requirement exists when a defendant's disclosure is not required by the Act was not before the court.

In this case, Plaintiff's state common law claims are not based on the sort of statutorily required disclosures to which the heightened scienter requirement applies.  First, §§ 1681g and 1681h impose requirements on credit reporting agencies only when they disclose information to consumers.  In contrast, the basis of Plaintiff's defamation claim here is the CRAs' reporting to third parties.  Second, as § 1681m and the final category of claims described in § 1681h(e) apply only to "user[s]" of consumer reports, they are inapplicable to Defendant CRAs, who are not a users of credit reports but suppliers of credit reports to those entities that use them.  Nor do they apply to Bank of America as there is no allegation that any of the Defendants took any "adverse action," as defined in § 1681a(k), based on the erroneous consumer report.

Lest there be any argument that § 1681h(e) would never apply under Plaintiff's interpretation, § 1681h(e)'s grant of qualified immunity to credit users and furnishers for required disclosures would apply, for example, to any entity that might have denied Plaintiff credit based on the false information in his credit report, and would have thus been required to make disclosures under § 1681m.  CSC's disclosures, on the other hand, were not required pursuant to §§ 1681g, 1681h, or 1681m, and therefore, just as in McAnly, do not qualify for the

*quid pro quo* grant of qualified immunity.  In other words, because the Act does not place on CRA's in CSC's position any burden to report in the first place, the Act does not recognize any need for qualified immunity as a counter-balance.

**B.** **The limited immunity section 1681h(e) of the FCRA explicitly permits a consumer to assert tort claims against any person who furnishes false information with knowledge that it is false or with reckless disregard for the truth.**

Even if the heightened requirement in § 1681h(e) did apply, the present claims should not be dismissed because they satisfy the heightened requirement.  Section 1681h(e) does not preclude a consumer's claim for defamation, invasion of privacy, or negligence; it simply imposes a higher standard (i.e. willfulness or malice) than would normally be required.  See Olwell, Civ. No. 01-1481, slip op. at 12 (JRT/FLN) (D. Minn. 2003) (Goolsby Aff. ¶ 11, Ex. J); Sheffer v. Experian Information Solutions, Inc., Civ. No 02-7407, slip op. at 5 (E.D. Pa. 2003) (Goolsby Aff. ¶ 13, Ex. L) (citing Vazquez-Garcia v. Trans Union De P.R. Inc., 222 F. Supp. 2d 150, 162 (D.P.R. 2002)); Hogland v. First Security Bank of Idaho, 819 P.2d 100, 102 (Idaho 1991) (upholding trial court's jury instructions in libel action that omitted reference to FCRA immunity if jury found that defendant's statement was made with "knowledge that it was false or with reckless disregard of whether it was false").  Cases to have recognized that a plaintiff can proceed with state law tort claims, provided that he or she has pleaded the requisite level of scienter required by § 1681h(e), include cases decided sine the FCRA was amended in 1996.  See, e.g., Dornhecker, 99 F. Supp. 2d 918, 930-31 (N.D. Ill. 2000) (finding that the FCRA did not bar the plaintiffs' defamation claim).

Any suggestion that § 1681h(e) requires a showing of an "evil motive" is wrong.  The Eighth Circuit indicated in Thornton that the "malice" standard can be satisfied by a statement made with "knowledge that it was false or with reckless disregard of whether it was false or not." Thornton, 619 F.2d at 703 (quoting New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964)).

While Thornton articulated that the standard for "malice" under § 1681h(e) is qualitatively different from the standard for "willful" violations for punitive damages under 1681n, Thornton does not impose a higher standard requiring a showing of evil motive.  To the contrary, by holding that satisfaction of the New York Times standard is at least one way to overcome a qualified privilege, Thornton shows that reckless disregard for the truth, even with out evil motive, suffices.  Thus "malice" under § 1681h(e) is shown by a disregard for the *truth*, whereas "willfulness" under § 1681n is shown by a disregard for the *provisions of the statute*.  While "malice" and "willfulness" will often be present in the same case, Thornton simply stands for the proposition that a jury must be separately instructed as to each.

While the Eighth Circuit, as noted above, did confirm in Phillips that neither malice nor an evil motive are required to recover punitive damages under § 1681n, Phillips did not hold, as CSC suggests, that a "higher standard" or an "evil motive" are required under § 1681h(e).  In truth, Phillips did not once mention § 1681h(e).

In this case, a reasonable jury could easily conclude that Defendants' conduct exhibited a reckless disregard for the truth.  CSC, Experian, and Bank of America each disregarded information in their possession and bungled their communications with one another.

If to show malice it is necessary to show improper motive, a jury could infer that CRAs are driven by profit at the expense of accuracy.  Indeed, the evidence suggests that the industry understand this economic calculus, and is primarily concerned with *volume*.  Hence, a jury could reasonably infer that Defendants' procedures were designed not to assure maximum possible accuracy, but to assure maximum possible economy.  Such motive shows contempt for the law and for the rights of consumers, who are not in a position to exercise any marketplace control over which CRAs creditors use.

<u>**CONCLUSION**</u>

For these reasons, Defendants' Motions for Summary Judgment should be denied in their entirety.

Dated this 24th day of September, 2004.            Respectfully submitted,


By:   <u>s/John H. Goolsby</u>
**CONSUMER JUSTICE CENTER, P.A.**
Thomas J. Lyons, Jr.
Attorney I.D. #:  249646
John H. Goolsby
Attorney I.D. # 0320201
342 East County Road D
Little Canada, MN 55117
Telephone:  (651) 770-9707

**THOMAS J. LYONS & ASSOCIATES**
Thomas J. Lyons
Attorney ID # 65699
342 East County Road D
Little Canada, MN 55117
Telephone: (651) 770-9707

Attorneys for Plaintiff